172650 Catawpa Gardens Condominium Association v. Bank of America May it please the Court. My name is Christopher Gallinari. I represent the appellant, Catawpa Gardens Condominium Association. I'd like to discuss with the Court why the Circuit Court committed error in ruling as a matter of law that her claims are not timely brought. And I'd like to discuss why the Circuit Court committed error in ruling that we did not plead valid claims against Bank of America. This is a case where we represent a condominium association whose unit owners were deprived of meaningful choice, who suffered a financial detriment and were left without recourse. Bank of America says it could not be liable because it was a construction lender. But if it had been acting as a construction lender, it could have provided further financing to the developer for it to complete the project. But at a greater cost to itself. It could have foreclosed on its collateral, completed the development as a disclosed developer-seller, or sell the whole project to another entity. But if it had done that, the value of its collateral would have fallen. It only would have been able to realize fire sale prices because the project would have been tainted by the failure of Catawpa Partners. But at least then the purchasers would have been permitted to make fully informed decisions about where to buy and what condominium to live in and at what price. But because of what happened here, they never had that ability. We're complaining about Bank of America acting extraordinarily, getting an insolvent borrower who was already out of business to continue working for it, for nothing, to complete the project. Tell Mr. Coneo... Mr. Gellinari, is that how you say it? Yes, Justice Coneo. How is Bank of America's action in this case specifically different than how a bank would act in any project where the developer has gone belly up and the bank wants to recover or recoup something? Isn't this what they would do? No, here they are actually taking over the completion of the construction itself rather than saying, Mr. Cornelius, continue doing your business as usual. Tell me specifically what things you, what acts they have committed that constitutes, in your view, taking over construction. Participating in every decision that had to be made with respect to how the interior construction of the remaining units was to be completed, taking all of the sales proceeds as it came in, deciding what portion of the proceeds would go to it as opposed to what portion of the proceeds would be used to fund the remaining construction, and then deciding alongside Mr. Cornelius what is going to be done in what particular unit as we finish out the build out of the interior units, what is going to be done to market these units, how these units are going to be sold and to whom. Actually participating in the actual development of the project rather than saying, you do it, we're going to stand back and wait for our collateral to improve in value. They could have done that, but here they propped up Mr. Cornelius and Catapa Partners and used them as an instrumentality in order to provide the appearance of a viable functioning entity when in fact there was none. But here's, you know, you make the point over and over again that Cornelius was out of business. He wasn't out of business from my reading of this record. He was still in business doing exactly what you said he was doing. He was the one selling the units and, you know, doing basically what he had done before. Before consideration and the consideration the bank gave him was the forbearance on the loan. Well, we also allege that had there not been this off-the-books side agreement, there would not have been anything further that Mr. Cornelius would have done. He would not have continued working for three years without compensation. It was compensated because the bank gave him a forbearance on the loan and ended up presumably forgiving some of it. That's the consideration. I don't see that he did it for nothing. Well, that is the consideration for the joint venture. They both agreed to share in the revenue stream coming forward. Mr. Cornelius would have the millions of dollars of guarantee obligation that he owed to the bank forgiven if he did this for the bank, allowed the bank to prop him up as its instrumentality and continued doing what he otherwise would not have done. Because if the bank had been acting just as a lender, it would step in, foreclose, and end. They would foreclose and ask for a receiver or do a mortgagee in possession. And then we would have gone in a different position, Justice Stewart. That's not the case. I'm going to ask you, when did the Condo Association find out about the forbearance agreement? Did they know that when they came in? They came in August of 2010, is that right? Yes, that's when the turnover was. But we did not learn of this arrangement until a conversation occurred between attorneys for our firm and attorneys for Mr. Cornelius in the summer of 2016. I think that's what we say in our brief. And shortly thereafter, in September of 2016, we brought the claim against Bank of America. But it seems the circuit court relied on the fact that when the owner board took over, it had a due diligence report found that discovered leakage. And it seems to me the circuit court believed the clock started ticking at that time and then five years had passed and then they still hadn't filed suit against Bank of America. Well, two points. One, the question becomes when do our claims accrue in general as to any of the defendants? And second, when do they begin to accrue as against Bank of America as an unknown additional cause of the harm at the time that the condominium association initially filed suit? What we have was leakage, repairs that were done in 2009 and 2010, and then a transition study. And it's not clear from the record whether there's continued infiltration or whether we are looking at the results of the infiltration that the previous repairs had attempted to remediate. So in cases such as Knox College and Henderson Square, they instruct that these become facts that may result in a delayed discovery of what eventually turned out to be a latent defect that these homeowners did not know about until the second engineer, BTC, conducted invasive testing and opened the building. That's what disclosed the latent defect that we bring suit on here. So are you saying then that there's two different styles of leakage? There was the leakage that was fixed first and there was an entirely different kind of leakage that, because it's so different, started a new clock accruing at some point? No, I'm saying that when the plaintiff should have known of its injury and that its injury was wrongfully caused is a triable issue of fact under Henderson Square. And Henderson Square lays out the engineer who inspects the building, the contractor who then comes and opens up the building and conducts invasive testing and learns of the latent defect. All of this is the collection of facts that the trial of fact must take and decide based upon not just the allegations but then further evidence into what the homeowners knew or should have known based upon what occurred in determining when the cause of action accrued. It's not possible to do this as a matter of law. That's what Henderson Square ruled, and that was the big error of the circuit court with respect to determining within that panoply of facts that Henderson Square says, these are the universe of facts that the fact finder must take and make a decision upon. And it was error for the circuit court to drive into the middle of that panoply of facts and say, I'm establishing a bright line rule here. That's completely contrary to Henderson Square. Let me ask you, as far as the transition study, that wasn't ordered by your folks. It was ordered by the development board, is that right? I'm not sure who ordered the transition study by reserve advisors, Justice Connors. Well, it came in as of September of 2010. September 2010. Yeah, so it was pretty soon thereafter. It was immediately followed and turned over, yes. Let me ask you this. Who signed off on the transition study? Who prepared that and signed the document? A company called Reserve Advisors. Yeah. And it was not a lawyer, though? No. I'm not asking this. There's much made about this suggestion in the transition study that you need to contact a lawyer. Was that in that document? I believe so. But it wasn't signed by a lawyer. Was this a legal opinion of some kind? It was just something that was in the transition study, right? It was not a legal opinion by a lawyer. Right. So I just want to make sure that's clear. It was signed by a non-lawyer. Correct. Thank you. The circuit court – so that's the error with respect to when do our claims accrue with respect to any of the defendants because Henderson Square and Knox College teach that it's an issue of fact and you can't drive a bright line rule into the middle of it. But even if our claims against other defendants accrued at an earlier date as a matter of law, that doesn't mean that our claims against Bank of America accrued then either. Mitzias says, quote, We hold that where a plaintiff knows or should reasonably know that her injury was caused by one source but remains unaware of another source that could not be discovered through the exercise of diligent inquiry, the statute of limitations does not begin to run with regard to that second source until such time as that second source would become discoverable through diligent inquiry. And I know because Bank of America has said that Heredia and Cribs, the court said, Well, on the facts of Mitzias, that's a cause that was unknown to science. All right. Taking that case and putting it on our cooperative ordinance, you know, 172650. All right. Isn't the source, the source, the particular defects that caused the leakage as opposed to the identity of Bank of America as a lender slash alter ego developer? No. No, I don't believe so, Justice Delord, because in Landreth v. Fabricius, which is a case we cite in our reply brief, the court there parsed through different defendants causing injury. At paragraph 37 of its decision, the court held, Landreth could have reasonably surmised that he was being injured by the city and that the city was breaching a valid agreement but not that Landreth was injured by his attorneys. So that's a case where you have different defendants, and just because you're on notice that you may be harmed by one defendant doesn't mean that you're on notice of being harmed by other defendants. Also, in Knox College, there was the issue that there may have been harm wrongfully caused to the owner of the building by a subcontractor, but just because the owner was placed on notice of the possibility of harm having been caused by a subcontractor, that did not place the owner on notice of the claim that it had against the supplier of the defective woodland material. And so that's another case where just because you're on notice with respect to one, that doesn't mean that you're on notice with respect to another. And Mixius is not so narrowly reasoned as Heredia and Cribs make it out to be. Mixius relies upon Fox v. Ethicon from the California Supreme Court because there the surgical stapler was not unknown to science. There was no discussion of that there. Mixius said that the proposition that the statute of limitations begins to run itself, all defendants would place the plaintiff at risk of sanctions for filing claims against additional defendants without factual support. And in Mixius, the court wrote, we find the rule and the reasoning of Fox to be in line with the discovery rule as it has developed in Illinois for the reasons stated above. And that's true because we see that in all of the cases. In McCormick v. O'Cleary, a case relied upon by Cribs, the court wrote significantly, this is not a case where defendant's identity was concealed. His identity was disclosed in the medical records which plaintiff possessed prior to filing. And that's true on the facts with respect to Heredia and Cribs also. In Heredia, the cause and both the defendant was known to plaintiff at the time she filed her initial complaint because it was discussed in her medical records. Cribs, right at the outset, in paragraph one, the court says, guarantee suit Somerset and its founder Cribs, alleging that Cribs acted in concert with an unidentified guarantee employee. Then six years later, they tried to add the employee as a defendant. But at the time of the initial complaint, not only was the rule discoverable, it was actually disclosed and known. That's not this case. We don't have any knowledge or notice of Bank of America's offer books arrangement with Catawba Partners and Cornelius. When did you – when specifically? In your briefing, you said you discovered that in 2016, during the summer of 2016. Tell me specifically when. Specifically when during the summer of 2016? I do not know. No, but you're asserting that it's during the summer of 2016 that you became aware of it. Before that, you had no knowledge of the bank's involvement. I think it came under deposition, didn't it? No, no. There haven't been depositions. It was in a conversation with attorneys. There hasn't been discovery because – I'm just – my question is very narrow. When specifically did you – your clients come to know of the bank's involvement in the role in which you are now asserting basically was that they were in fact managing the project? During the summer of 2016, a few months before we filed suit. Okay. I'm sorry, Justice Cunningham. I thought I had said – Counsel, as far as the 615 aspect of all this, as far as the trial court's ruling, as to the alter ego complaint or count, did the court really give a reason as to why it thinks you did not state a claim for alter ego? I think it said that it did not find the facts rose to the level of equitable ownership. It focused on that aspect. But I don't think it focused at all on CREVO and the instrumentality theory. We allege a domination of control. The level of control that the bank held over Mr. Cordelius and Catawba Partners also is an issue of fact that we can't resolve here. We allege a joint venture. We also allege such domination of control that an instrumentality occurred. Was that the language, I don't think? I'm sorry? I'm concerned that the trial court did say, I don't think, because I know the trial court did say, as far as the aiding and abetting claim, I don't think that a prime case case was met. I mean, I don't think – no, I don't think adequate facts were pled. I'm concerned about that language. Did the trial court say, I don't think that adequate facts were pled? If that's what the transcript says, then yes. But I think that you are speaking now to the aiding and abetting fraud claim. Yes. The aiding and abetting and the alter ego. Was that the language that the trial court used? Yes. And while we're on that, the alter ego claim, which I think we all sort of stand by itself in a way. What's your authority for the proposition that there is such a thing in Illinois as a single count, a claim, all right, a complaint for what we would call alter ego? Because it's a remedy.  It is, Your Honor, and I think that that was addressed in the briefing before the circuit court. I think that's true. What we are alleging through what we have denominated as an alter ego count is that Bank of America should be liable for the liabilities of Catawba Partners and Mr. Cornelius to the condominium association. The same way we allege under count 20 in the joint venture that under Tassin, if a joint venture is found, then the joint and several liability occurs. And under the alter ego count, if the instrumentality or the existence of the alter ego is found, then Bank of America shares in the liability that Catawba Partners and Cornelius owe to the condominium association. That's all it's saying. So if it is redundant to those other counts, then that can be addressed easily. Counsel, let me ask you this. As far as the time frame when Mr. Cornelius was selling condos out of Catawba, did he at any time advise the prospective purchasers that there was this forbearance agreement between himself and the bank or that there were any issues relative to water coming into the bricks on the property? Any disclosure of that relationship with the bank or the issues of the defects in the property? No. No as to the relationship with the bank. And as to issues with respect to water, there were repairs that were undertaken in 2009 and 2010. Those are facts of record. Whether there were discussions between the developer representatives and people who lived in the building at that time, I don't know. There very well could have been. But we don't see anything in the record showing that after those remedial efforts in 2010, the problems continued to manifest themselves and caused unit owners to have further discomfort and distress. We do know that BTC opened the buildings and discovered the latent defects when they did. And I understand that. But my question really is, is there any responsibility of those folks to disclose to prospective purchasers that there are hardly any reserves, number one, and the fact that there are defects in the property? I mean, you didn't know anything about that, but they did. And do we know if there was any disclosure? You don't know that because you didn't have discovery, correct? You haven't had any discovery. But based upon what we know, there was no disclosure of things other than what the unit owners actually knew. But the more specific question that Justice Connors asked, which is what I would, you have not had any discovery in this case, is that correct? That's correct. When we filed a further amended complaint, it was in response to previous dismissals of the claims that were stated against the previous defendants. So it wasn't as though we were seeking leave to file a fourth amended complaint to add facts that were established during discovery. If that had been the case, I think that we'd see a more robust complaint with evidentiary facts. But we don't have those at this point. Is the fourth amended complaint still the complaint that's pending? Yes, I believe so. And the case is on the stay calendar below. My next question was, is there anything that's been going on since the briefing started here? There were activities below, but the case is now on the appellate stay calendar. I'm not sure of all of the details of what happened at the circuit court level since the appeal was filed, but it since has been placed on the appellate court stay calendar. I think another thing that's important to point out is the court's error in relying upon Kalisakis as a case that rejects the California case of Conner v. Great Western when that's not the case. Could you start wrapping up, please? If I could, Justice Cunningham. Because Kalisakis does not reject Conner. It actually says, we don't believe the rationale of Conner should be expanded to meet the facts in the alleged complaint. Kalisakis says Conner applies where the bank becomes, quote, an active participant in the construction enterprise, and that's the case here. And which count does this apply to, counsel? I'm not sure. It applies to all. Because really what Bank of America is saying is that under Kalisakis, we have broad immunity no matter what we do. And that's just not the case because Kalisakis says if you're acting other than as a usual money lender, liability can be imposed based upon the facts. We just don't believe that the reasoning of Conner applies to the particular facts before us, which are far different from the facts before this Court here based upon our allegations. I don't know how much time I've used. If I have any time remaining for one other? Very little. Okay. All right. And thank you very much. Good morning. My name is James L. Allen. I represent the defendant, Appellant Bank of America. I would like to discuss two cases in addition to answering any questions that the Court may have of me. Knox College is the key case on the discovery rule as it relates to for purposes of cruel of the statute of limitations. Knox College was also a construction defect case similar to this case. In Knox College, there was a roof that was leaking. It leaked for three years after it started leaking right away and leaked for three years. In year six, a plaintiff in Knox College received a report that indicated your roof may be leaking because of a defect, that specifically the contractor put in a two-ply roof rather than a four-ply roof, and that may be the cause of your problem, is or may be the cause of your problem. Two years later, the college replaced the roof and filed suit shortly thereafter. So it was eight years after the initial construction and two years after the report. Trial court faced with those facts based on the discovery rule before Knox indicated, you don't need an expert report to know that when the roof leaks for a period of time, that's a defect. Statute runs at that time. It was a five-year statute. Case dismissed. On appeal to the Court of Appeals, the Court of Appeals kind of struggled and said, well, when does the plaintiff really know and so on, and based on this thing, we think that it's probably when you got the report in year six, you filed within two years, therefore reversed the trial court. Now, the difference between that case and what we have here is the suit against Bank of America was not filed for five years. It wasn't, you know, it actually wasn't filed until six years later. So they blew the statute under the Court of Appeals ruling in Knox. Knox College went up to the- Can I ask a question right here? Their argument is that they did not know that Bank of America was involved in any other, in a way that was other than the way lenders are normally involved until the summer of 2016. Does that make a difference? No, because under the discovery rule, you have to not only discover, you have a duty to inquire, make inquiry not only to the fact of whether it was wrongfully caused, and wrongfully caused means is there a claim and who's the defendant? So you have to learn both. Well, I think we do. And that's what the Haynes Court did. That may be true, but in terms of common sense, most projects of this type will have a lender. And the lenders are usually not in an integral relationship where they're managing the construction. It's not usual that that would take place. Are you saying that they should have inquired as to whether or not Bank of America was playing a role other than a lender and discovered that earlier? Is that what you're saying? Yes. Well, I will say two things. First of all, we're saying we weren't actually supervising the construction. But in addition to... I'm saying that this time. But assuming they were, they would have had to learn that within five years of knowledge. You know, once the duty of inquiry starts, they have to identify both was it wrongfully caused, and was it also, and who is responsible? Because fundamentally, Bank of America never lifted a hand on this. And if you assume your facts that the bank is intimately involved in the construction, that should have been easily discovered within five years. You know who's actually there. Also, how would that be? How would you... The fact that they didn't discover it until 2016, I have to assume they're telling the truth, means that it wasn't as obvious as you're contending it was. Well, that's the... You go back to the Hames court that says... I'm just talking about the facts of this case. How would they know that the bank, assuming for a moment what they're saying is what they believe, that the bank had stepped outside the role of a normal lender and was in fact directing the project in a way that a normal lender doesn't do? How would they discover that? They would discover that by pursuing their claims. They would have to, the same way they found out here. They would file this lawsuit. But they didn't have any discovery. How would they know that? I mean, from what I read in the brief, it came out in conversation. The plaintiff's counsel indicated that they found out by talking to the developer. So that's how they would do it. They would talk to the developer and say, we have a claim here that it is a construction defect. Tell me why it wasn't resolved earlier and why couldn't that conversation have been... Are you saying that if they didn't talk to the developer and didn't find that out, then they're like, oops, you're out of luck? Is that your argument? Absolutely. This is a 2014 Law Division case, right? Correct. So at that point there was a complaint on file. Correct. To a bunch of people that they all knew who they were. Right. And then they didn't do any discovery and they still haven't done discovery four years later. Correct. Right? And now they're trying to say eight years... Because if they had started discovery in 2014 when the case was filed, they probably would have gotten their foot in the door for Bank of America under... Correct. And frankly, if they hadn't waited two and a half years to do their final report, they were lying on a... They didn't even sue us. You know, they were very dilatory in how they approached this. They were told point blank in September 2010, point blank, that you have construction defects that the developer has spent two years trying to repair, that 40 units have been repaired, that it's still a problem, and that it's going to cost you $3.8 million to correct this. Counselor, let's talk about Henderson for a minute. Henderson Square. Are you going to talk about that case? No, I plan to talk on Max College because I... I want to talk about Henderson. Certainly. Let's talk about that. I'm looking at paragraph two. This is from the Illinois Supreme Court. Paragraph 52. The discovery rule postpones the start of the limitations period until the party knows or reasonably should both know that an injury occurred and it was wrongfully caused. Next sentence. At the point when the party knows or reasonably should know that the injury was wrongfully caused, the party is under obligation to inquire further to determine whether an actionable wrong has been committed. It sounds like more than a one-step process when you read the Illinois Supreme Court's ruling in Henderson. So it says the party is under obligation to inquire further to determine whether an actionable wrong has been committed. And isn't that similar to what happened in this case? They got this notice something might be wrong from a report that they didn't order and was really a report to find out about budget. Let me finish. And then they got another report which sadly took a long time to get back but finally told them here are the problems, and they realized they had an actionable case and then they pursued it. Isn't that in compliance with Henderson? I don't – there's a lot of questions there. First of all, I want to go back to the report. The report was directed to the board of directors, so it was not – it might have been ordered by the manager, but it went to the plaintiff board. Okay. So what does that mean? What I would indicate is that the Hereta case, which came from this circuit, wrongfully caused does not mean marriage of a specific defendant's negligence. I'm looking at the Illinois Supreme Court counsel. Can you explain away this case to me? This is what I'm troubled with. I think they complied with Henderson. Please tell me how they did not. The reason they didn't comply with Henderson is the Henderson case was against the developer, not against a lender, first of all. Second of all – Tell me what statute of limitations this applies to. I understand. Okay. But in that case, there was an actual misrepresentation by the developer, and that was the key part to that case. Well, there's allegations of fraud here, is there not? There's no allegation that the lender committed any fraud. Well, the aiding and abetting part, which – Which is a very different thing. That the fraud that's been alleged is alleged as to the developer. And in this particular instance, the fraud that was disclosed in Henderson Glass was that the developer represented that insulation was in the walls, which could not be discovered until the walls were opened up. And the other misrepresentation in Henderson Glass was a misrepresentation that the budget for repairs was inadequate. And in our case, in September 2010, the board of directors was told point blank that your budget is insufficient, that you need $3.8 million. And at that point, they had knowledge of a fraud, and they had five years from that point to file suit. Let me finish over the last sentence of paragraph 52 in the Henderson Square case. The question of when a party knew or reasonably should have known both that an injury and its wrongful cause is one of fact, fact question, unless the facts are undisputed and only one conclusion can be drawn from them. Do you think it's so undisputed that they were on notice from the September 10th report? It's totally undisputed, there's no question here? Correct. Because at that point, they knew about the repairs that were inadequate. They were told by an outside expert that there was $3.8 million in defects. They were told that you need to engage both a lawyer and a consultant to investigate further. And they did file someone to investigate further. And they did file suit timely. They just didn't file any claims against Bank of America in a timely manner. Let me bounce back to a question I asked opposing counsel about, you know, do we have two different kinds of leakage here? Because you just identified in the very first report $3.8 million of repair would be required to fix that leakage. Is there additional leakage that somehow was discovered in the second report? Or it simply identified the same leakage but perhaps pinpointed it in a different way? We still have, it's an issue of accrual because they obviously didn't know in September 2010 the full extent of the defects. That was not known. Is it something, is it that when you say the full extent, the original extent was $3.8 million. Is it now up to $7.3 million or something? Well, the later report says it's $6 to $12 million. That's my question. But they were told that they needed to investigate further and to do, you know, further testing. And indeed, the second report indicates that they need to do further testing. But the issue is when does the statute accrue? And going back to Knox College, when we get to the Supreme Court, they reversed the Court of Appeals. And the reason they reversed the Court of Appeals is they said the discovery rule is a matter of inquiry. And what they said was it wasn't when the report came out. They said we don't know, it wasn't the first leak, but at some point along the line, you have sufficient knowledge to put you on notice that you need to make inquiry to determine whether an action went wrong. So once it's under a duty of inquiry, it was possible that it was before the report came out. And that's what the trial court did exactly here. They said it might have been when the leaks occurred. It really was when the transition report came out in September 2010. But it was certainly in March 2011 when you went to a third party and initiated the inquiry. So it was their job to complete the inquiry within five years. And they didn't meet the five-year period as to any of those dates. And that's why the trial court should be affirmed. The second case I wanted to discuss is one that you're very familiar with, the Sienna Court case. You're obviously quite familiar with that one. The reason I wanted to bring that up is there was a consolidation of three appeals. There were two applications for leave to appeal to the Supreme Court. One was granted, one was denied. The reason I want to bring that up is really a procedural matter. The issue that we're relying on was in the first appeal, where the court indicated that the implied duty of habitability does not apply to either architects or to material supply men. We're not going to expand this notion. That particular decision of the court was not appealed. There was no application. We've secured the briefs that have been filed in the Supreme Court. And the last brief was filed last month. There is no issue. That is not an issue in the Supreme Court at all. And I would also indicate that the Park Plunk case that was reaffirmed in Sienna Court, we didn't indicate in our brief. But it was an application was filed with the Supreme Court and was denied. And I wanted to correct that in our brief. So this was, in all instances, a lender, a construction lender dealing with a problem loan acting in the ordinary course of business. The modification agreement that was entered in this case or was signed in this case and is part of the record would be typical of a construction lender dealing with a loan that was underwater due to changes in the economic situation under the Great Recession. This was just a very standard, typical way of doing it. The plaintiffs claim that a lender can only foreclose or only enter into it either in lieu of foreclosure to act in an ordinary manner is simply not the case. And that was why we cited the SAFT treatise on another way that a lender will deal with a construction loan that's in default is to enter into a forbearance or a modification agreement. So how would you describe the relationship between Mr. Cornelius and the bank? What was that relationship? It was a borrower-lender relationship. Well, first of all, not Mr. Cornelius. Our relationship was with Mr. Cornelius, LLC. But it was a borrower-lender relationship as defined in the construction loan agreement and the modification agreement before the court. But under the forbearance, he was acting as a sales representative, correct? No, he was acting as a developer. But he was outselling the units. No, it was a third party that was selling the units. Well, who got the third party? Pardon? Who obtained the third party? It was Cornelius. It was the developer. Correct. The allegation is that he was secured by the developer but approved by the lender, which would be a standard practice. But, again, this was all part of the forbearance agreement, though. So he did this for three years without pay, and that was part of whatever the back and forth was in that contract, correct? Yes. That would be part of that. The release actually came later. The release is not part of the record before the court, but it is an allegation. And he was released. During that time when he was acting, did he ever disclose to purchasers or possible purchasers the situation with the financial situation of his corporation and or the defects in the building? We have no idea what Mr. Cornelius represented or didn't represent to the homeowners. Certainly the bank's loan was a matter of public record. Okay. Thank you. Thank you. Thank you, Mr. Allen. We would ask that the trial court be affirmed in all respects. Thank you. Mr. McNary. Thank you, Your Honors. I will try and cut you off if I go too long. With respect to Knox College, the court, it's right there in the decision. It is true that Knox knew that the roof leaked almost as soon as it was completed. The trial court found this was sufficient to alert Knox to the fact that something was wrong. We cannot say as a matter of law, however, that that event started the running of the limitation period. And then the court continues and says where there's repairs that were done, it may be that the nature of the leak and the fact that the subcontractor undertook at once to remedy it were facts which would not cause a reasonable person to investigate further. This didn't lead to the court establishing an accrual date as a matter of law, but saying it's an issue of fact with respect to when the discovery rule applies, when the claim accrues, because as later recognized in Henderson Square, these types of repairs can result in a delayed discovery of what turns out to be a latent defect. And going back to what Justice DeWart was saying earlier, I think that when we're talking about water infiltration and water leakage, that's the manifestation of an injury. And you don't necessarily know what the injury is until you open up the building and find the latent defect. I would say that the latent defect is the injury. Water infiltration is a symptom of it, but it could be a symptom of something else. It could be just something that needs to be handled with regular maintenance or something related to something more minor with the building. So I think it's a misnomer to focus on water infiltration as the injury. I think the injury is the latent defect that was discovered when BTC opened the building. And with respect to what the Reserve Advisor's transition study said with respect to it said that there was an injury. It said that there was a defect of $3.8 million. We point this out in our reply brief at page 4. What Reserve Advisor said with respect to its biggest ticket item was the flashing did not protrude from the face of the building. It only went up to the wall. It didn't go outside beyond the wall. And in its opinion, that was wrong and needed to be replaced. But as BTC later said, that's not even an error in construction. That's fine. You don't need flashing to go out beyond the face of the building. It only needs to go up to the wall itself. So the largest ticket item in Reserve Advisor's study isn't based upon any sound engineering science and was refuted by the engineer that the association later retained. Counsel briefly alluded to the Haines decision. That was another case where there's no concealment of the identity of the defendant. That was where an elevator accident occurred and the sills were removed from the landings where the elevator joins against the floor. And it turns out that the previous occupant of that building was the person who had removed the sills from the landing. But there was no indication that the previous occupant of the building was unknown or concealed. The occupant of a building in the ordinary course of its building will, in the ordinary course of its business, will do things around the building to make itself, to make the building fit its preferred accommodations. So that wasn't an extraordinary circumstance like we have here. Yes, the loan was a fact of record, but there was nothing until the summer of 2016 that could have eluded us to anything beyond that because of the fact that we were not even at issue with Katapa Partners, and Mr. Cornelius, and no discovery has been taken, bears that out. The allegation that your budget is insufficient, well, that's not what Reserve Advisor said. It said that you have what we think is a big-ticket item. Was there any opportunity for discovery at any point after the loss of this file? I don't know if there was a formal stay issue, but I know that the practice in the Circuit Court in many calendars is that I don't want to submit parties to written or oral discovery until we know what issues they're going to be called upon to address or refute. Otherwise, you're going to have to go back and depose them again. If I say your complaint needs to have these five or six allegations added to them before I'm going to bless it, and you take somebody's deposition before that, well, then there's going to be another deposition as to those additional five or six allegations. So that's not the way the practice goes in the Circuit Court of Kennedy, as I'm sure you might as well. We have plenty of cases where the first thing we go through the record is a complaint. There's an answer or an appearance, and boom, there's discovery going on. That happens, too. Yes. Okay. But that's not this case where we're talking about a complicated construction defect and reserve claim. If the Court has any further questions for me. Because your opponent basically suggested that had you done some discovery, you could have found that out. I mean, that's basically what he said, and I'm just trying to find out if you had an opportunity. That's all. We did not have an opportunity before Mr. Cornelius's attorney volunteered this information in a conference with attorneys from our firm in the summer of 2016, as we said in our brief, and that relates back to the allegation in our complaint that we did not have an opportunity before the lawsuit was filed, certainly, to undertake that. But given the question of fact as to the accrual of the claims with respect to all defendants, it's still a triable issue of fact, even if our time to run as to all defendants starts at the same date. And we believe that our time as to all defendants does not start based upon the reasoning of Mitzias, and we timely acted once we had reason to know of Bank of America's extraordinary involvement. If the Court has any further questions. Okay. Thank you. Thank you very much, Your Honors. Thank you, counsel, for a very complete and thorough argument. This case will be taken under advisement. The Court is adjourned.